IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

H.O.P.E., INC. d/b/a HOPE FAIR      )
HOUSING CENTER, an Illinois         )
Not-for-Profit Corporation,         )
                                    )
                Plaintiff,          )
                                    )   Case No. 15 CV 9715
        v.                          )
                                    )   The Honorable Joan B. Gottschall
ALDEN GARDENS OF BLOOMINGDALE,      )
INC., et al.                        )
                                    )
                Defendants.         )

**MEMORANDUM OPINION AND ORDER**

This is one of four related cases stemming from *H.O.P.E., Inc. v. Eden Management, LLC, et al.*, No. 13-CV-7391. In each case, H.O.P.E., Inc. ("HOPE"), a private, not-for-profit corporation, and in some cases one or more individual plaintiffs, bring claims against, among others, various current and former Illinois officials (collectively "State Defendants"). Each case also involves a different group of nonstate defendants which allegedly operates a different Supportive Living Facility ("SLF") in Illinois. Plaintiffs, only HOPE in this case, *see* Compl. at 1, 5–6, ECF No. 1, generally allege the State Defendants and the SLF operators have unlawfully excluded individuals with mental disabilities from participating in the Supportive Living Program ("SLP") in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* and the Rehabilitation Act, 42 U.S.C. § 794.

The three alleged Supportive Living Facility defendants named in this case, Sandy Horvath, Alden Gardens of Bloomingdale LP, and Alden Gardens of Bloomingdale, Inc. (collectively "Alden Gardens Defendants"), move to dismiss HOPE's claims against them for

lack of standing and failure to state a claim for which relief can be granted. *See* Fed. R. civ. P. 12(b)(1), (6). For the following reasons, the court grants the motion in part and denies it in part.

## I. BACKGROUND

### A. The Supportive Living Program

The court described the pertinent statutory and regulatory background in its opinion in *H.O.P.E., Inc. v. Eden Management, LLC* ("*HOPE I*"), 128 F. Supp. 3d 1066, 1069–70 (N.D. Ill. 2015). The court repeats that background here with minor updates to provide context.

Medicaid, enacted in 1965 as an amendment to the Social Security Act of 1935, is a joint federal-state program that provides medical assistance to low income individuals.[1] *See* 42 U.S.C. § 1396 *et seq*. Although the federal government does not require states to participate in the Medicaid program, once they do, they "must comply with federal statutes and regulations." *Bertrand v. Maram*, No. 05-CV-0544, 2006 WL 2735494, at *1 (N.D. Ill. Sept. 25, 2006) (citing 42 U.S.C. § 1396a(a)(10)), *aff'd sub nom. Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452 (7th Cir. 2007); *see, e.g.*, 42 C.F.R. §§ 440.210, 440.220 (listing mandatory services a participating state must provide to the "categorically needy" and "medically needy").

The provision of mandatory services is not at issue here. Rather, these cases center on a voluntary program, the Supportive Living Program, which the State of Illinois initiated after "apply[ing] for and receiv[ing] a waiver of Medicaid's normal rules" in order to provide "home and community-based services" ("HCBS"). *See Bertrand*, 495 F.3d at 454 (citing 42 U.S.C. § 1396n(c)(1)). Under § 1396n(c)(1), a participating state may offer services in community settings to qualified individuals who: (a) but for the provision of such services, would require a level of institutional care such as a nursing home; (b) are members of a target group that is

---

[1] "[A]dministration [of Medicaid] is entrusted to the Secretary of Health and Human Services (HHS), who in turn exercises his authority through the Centers for Medicare and Medicaid Services (CMS)." *Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006) (citation omitted).

included in the waiver; (c) meet applicable Medicaid financial eligibility criteria; (d) require one or more waiver services in order to live in the community; and (e) have the right to participate in the waiver program in lieu of receiving institutional care.

The State of Illinois operates nine separate "Home and Community Based" waiver programs. Each program targets a different segment of the state's population. *See* https://www.illinois.gov/hfs/medicalclients/hcbs/Pages/default.aspx (last visited Sept. 11, 2017). The waivers are: Children and Young Adults with Developmental Disabilities-Support Waiver; Children and Young Adults with Developmental Disabilities-Residential Waiver; People who are Medically Fragile, Technology Dependent; Persons with Disabilities; Persons with Brain Injuries; Adults with Developmental Disabilities; Persons who are Elderly; Persons with HIV or AIDS; and Supportive Living Facilities. *Id.*

For an applicant to qualify for the last in the foregoing list of programs, the Supportive Living Facilities program, he or she must:

> 1) Be age 22 years or over with a disability (as determined by the Social Security Administration) or elderly (age 65 years or over); and
>
> 2) Be screened by the Department [of Healthcare and Family Services ("DHFS")] or other State agency screening entity and found to be in need of nursing facility level of care and that Supportive Living Facility placement is appropriate to meet the needs of the individual . . . .; and
>
> 3) Be without a primary or secondary diagnosis of developmental disability or serious and persistent mental illness, as determined by a qualified Department of Human Services screening agent; and
>
> 4) have [his or her] name checked against [government offender websites and databases].

3

*See* Ill. Adm. Code tit. 89 § 146.220(a).[2]

If an individual satisfies these and other criteria, then an SLF may admit or retain that individual as a resident.[3]

> An SLF is a residential setting in Illinois that provides or coordinates flexible personal care services, twenty-four hour supervision and assistance (scheduled and unscheduled), activities, and health related services with a service program and physical environment designed to minimize the need for residents to move within or from the setting to accommodate changing needs and preferences; has an organizational mission, service programs and a physical environment designed to maximize residents' dignity, autonomy, privacy and independence; and encourages family and community involvement.

*See* Ill. Admin. Code tit. 89 § 146.200.

**B. HOPE's Allegations Against Alden Gardens**

To be clear, the thrust of HOPE's claims in these cases seems to be its contention that the State Defendants promulgated and enforced a "no mental illness" policy applicable to SLFs. *See H.O.P.E., Inc. v. Eden Mgmt., LLC* ("*HOPE II*"), No. 13-C-7391, 2016 WL 4011225, at *4–5 (N.D. Ill. July 27, 2016). But HOPE also brings claims against alleged operators of particular

---

[2] DHFS tendered these criteria as parts of its waiver application to CMS and incorporated the criteria into the state regulations that govern Supportive Living Facilities. *See* Current Waiver, https://www.illinois.gov/hfs/SiteCollectionDocuments/SLPwaiver.pdf at 29 (last visited Sept. 11, 2017).

[3] On January 26, 2017, the State of Illinois published for public comment a proposed SLP waiver renewal application. Status Report 2–3, ECF No. 90 (N.D. Ill. May 5, 2017). The application for renewal proposes to make the following change to the targeting criteria:
> Potential Supportive Living Program (SLP) waiver participants must also be screened and meet nursing facility level of care. The SLP does not exclude specific diagnoses, as long as the eligibility requirements are met and the person is appropriate for placement with the SLP provider. The State will use PASRR [Pre-Admission Screening/Resident Review] to assess for persistent risks and needs to inform whether the person is appropriate for placement with the SLP provider.

*Id.* (quoting Application at 23, ECF No. 90-1), available in full at https://www.illinois.gov/hfs/SiteCollectionDocuments/SLP0326Draft.pdf (last visited Sept. 11, 2017). The record does not disclose whether the application for renewal has been approved.

Plaintiffs and the state defendants expressed agreement that this proposed change is not likely to moot these cases at a hearing held May 12, 2017. The record includes no evidence showing that the application for renewal has been approved, and the State of Illinois' website lists the application as pending. *See* https://www.illinois.gov/hfs/medicalclients/hcbs/Pages/default.aspx (last visited Sept. 11, 2017). As the court has no reason to think the application has been approved or any change has been made to the Supportive Living Program to conform it to the renewal application, the court intimates no view on what, if any, effect approval would have on these cases.

SLFs. Here, HOPE pleads its ADA, FHA, and Rehabilitation Act claims against the Alden Gardens Defendants in Counts I–III of its complaint. The remaining counts pertain to the State Defendants.

> HOPE describes itself this way in its complaint:
>
>> HOPE counsels both housing seekers and housing providers on their rights and responsibilities under fair housing laws. HOPE also provides complaint investigation services including the use of testers to help identify housing discrimination. All of these services are provided free of charge to the community. HOPE also provides professional and confidential consulting, training, and compliance services to rental housing providers, real estate companies, mortgage lenders, homeowners' insurance companies, municipalities, and governmental agencies.

Compl. ¶ 21.

HOPE states that it began investigating the Illinois Supportive Living Program after receiving complaints from individuals whose applications were rejected. *Id.* ¶ 59. That investigation and various reported complaints led to the filing of the first of these related cases. *Id.* HOPE continued to receive individual complaints and conducted its own investigation and testing from about November 2012 through at least February 2014. *Id.* ¶ 61; *see also id.* ¶¶ 63–99. This case resulted from the investigation of the Alden Gardens SLF in Bloomingdale, Illinois in November 2013. *See id.* ¶¶ 63–71.

HOPE alleges the following facts pertinent to the Alden Gardens Defendants. A trained HOPE tester called the Alden Gardens supportive living facility on November 15, 2013. *Id.* ¶ 66. The tester ultimately spoke with defendant Sandy Horvath ("Horvath"), who identified herself as Alden Gardens' marketing and sales director. *See id.* ¶ 67–70. The tester told Horvath that she was interested in placing her 81-year-old aunt. *Id.* ¶ 71. Horvath asked about the aunt's medical conditions. *Id.* The tester responded that her aunt suffered from arthritis and degenerative joint disease of the knee. *Id.* The tester also said that her aunt had been diagnosed

5

with schizophrenia that had been successfully controlled by medication for twelve years. *Id.* Horvath allegedly replied, "I doubt we could take her here because of her diagnosis, unfortunately." *Id.* Horvath allegedly "went on to tell the [tester] that she wasn't sure they had any availability" and suggested the tester call Alden Gardens' skilled nursing and rehabilitation center, which Horvath said provided a higher level of care. *Id.* (first statement is an alleged word-for-word quotation).)

## II. STANDING

The Alden Gardens Defendants first move to dismiss Counts I–III under Federal Rule of Civil Procedure 12(b)(1) for lack of standing. Because standing is jurisdictional, it must be addressed before the Rule 12(b)(6) motion, which goes to the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'" (quoting *Mansfield, C. & L. M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884))).

**A. Rule 12(b)(1) Standard**

A Rule 12(b)(1) motion to dismiss allows a party to challenge the existence of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). The plaintiff, as the party invoking federal jurisdiction, must establish that standing is proper. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015). When determining if subject matter jurisdiction is proper, "the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, unless standing is challenged as a factual matter." *Id.* (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004)). If a defendant factually challenges the basis for federal jurisdiction, however, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been

6

submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (alteration in original).

**B. Standing Principles**

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). "As a jurisdictional requirement, the plaintiff bears the burden of establishing standing." *Apex Digital*, 572 F.3d at 443. There is no such thing as pendant standing; "'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

To meet the minimum standing requirements of Article III, a plaintiff must prove three elements: (1) he or she suffered or will suffer a concrete and particularized injury that is actual or imminent; (2) the injury is fairly traceable to the defendant's action; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61; *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 291 (7th Cir. 2016). To survive a Rule 12(b)(1) motion challenging standing, "a plaintiff must plead sufficient factual allegations, taken as true, that 'plausibly suggest' each of these elements." *Berger*, 843 F.3d at 289 (quoting *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015)); *see also Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 624 (7th Cir. 2017) ("At the pleading stage, it is normally not difficult to pass the standing bar.").

**C. HOPE HAS Adequately Pleaded a Concrete Injury Fairly Traceable to the Alden Gardens Defendants**

The Alden Gardens Defendants claim that HOPE's complaint does not establish that it suffered an injury in fact fairly traceable to them. They point out that under the facts alleged in the complaint, the tester never submitted an application for the aunt, Alden Gardens never in so

7

many words denied the tester's aunt a spot based on her diagnosis of mental illness, and, they assert, Horvath's response, which they characterize as ambiguous at best, inflicted no injury. *See* Mem. Supp. Mot. to Dismiss 5–8, ECF No. 68 (citing *Freedom from Religion Found., Inc. v. Lew*, 773 F.3d 815, 821 (7th Cir. 2014).

The Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), "makes clear, however, that the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). The diversion of the agency's resources to investigating discrimination inflicts the necessary constitutional injury because were it not for the discrimination, "there would be more" resources for counseling and other services supporting its mission. *Id.* (discussing "opportunity cost" of fighting discrimination).

HOPE's complaint alleges an injury-in-fact under this standard. The Alden Gardens Defendants cite several out-of-circuit cases in their reply holding that the cost of litigation itself cannot be a fair-housing agency's sole injury, reasoning that organizations could manufacture standing by simply filing suit. *See, e.g., Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78–80 (3d Cir. 1998); *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994). Assuming, without deciding, those cases state the rule in the Seventh Circuit, HOPE plausibly alleges diversion of resources beyond this litigation. HOPE specifically pleads that it provides fair-housing counseling at no charge to housing providers and people seeking housing. Compl. ¶ 21. As for diversion of resources from conduct outside of this litigation, HOPE states that it conducted at least three outreach and education initiatives regarding the rights of persons with disabilities during the relevant time period. *Id.* ¶ 55. It also

8

alleges that individual complaints prompted its investigation of the Illinois Supportive Living Program, *id.* ¶ 59, and that conducting the investigation of other Supportive Living Facilities to determine whether the practices about which it received complaints were widespread impeded its educational outreach efforts and diverted its resources from its other programs, *see id.* ¶¶ 54–55, 59–62. As the inference of diversion of resources is plausible from these allegations, they more than suffice under *Havens Realty* to allege an injury in fact. *See Havens Realty*, 455 U.S. at 378– 79 (holding fair-housing organization's complaint establishing injury in fact by alleging that it "has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services"); *Dwivedi*, 895 F.2d at 1526 (organization could show that it was paid less for counseling services because it diverted resources to fighting discrimination); *Davis v. The Mansards*, 597 F. Supp. 334, 343–44 (N.D. Ind. 1984) (relying on *Havens Realty* to hold, after bench trial, that organization had standing because "defendants 'engaged in a systematic practice of discrimination against black applicants and homeseekers that frustrated the counseling and referral services, drained the resources and hindered the mission of the Northwest Indiana Open Housing Center").

HOPE also discusses a tester's standing to sue under *Havens Realty*. But HOPE did not join the tester who called Alden Gardens as a plaintiff, *see* Compl. ¶¶ 19–21, so the court need not analyze the tester's standing.

Neither will the court make the mistake of conflating tester and organizational standing. The Alden Gardens Defendants assert that *Havens Realty* and *Dwivedi* do not control because the Alden Gardens Defendants "did not make discriminatory statements or false representations to Plaintiff's tester." Reply 3, ECF No. 81. As explained in the Rule 12(b)(6) analysis, the complaint, viewed in the light most favorable to HOPE, plausibly alleges discriminatory

9

conduct. *See* Compl. ¶ 71. Even if it did not, however, *Havens Realty* would still foreclose this argument (though, of course, HOPE would lose on the merits). *Havens Realty* addressed tester and organizational standing. One of the testers, the Court held, lacked standing because he did not allege that any defendant misrepresented to him that apartments were unavailable. *Havens Realty*, 455 U.S. at 374–75. That did not doom the standing of the organization for which he was testing, however. *See id.* at 378–79. At the complaint stage, the broad allegations the organization's resources were diverted sufficed to plead an injury in fact. *Id.* at 379. The Alden Gardens Defendants' attempt to make individual tester standing the measure of organizational standing here must be similarly rejected. It is incompatible with the analysis in *Havens Realty*.

The court decides only that HOPE has alleged the essential ingredients of Article III standing to sue the Alden Gardens Defendants in its complaint. To conclude otherwise would be anomalous if this court has twice acknowledged that, at the complaint stage, HOPE's allegations that it diverted resources adequately alleges standing. *See HOPE II*, 2016 WL 4011225, at *4–5 (so holding; allegations regarding same testing described in the instant complaint adequately alleged that "HOPE . . . diverted resources as an 'opportunity cost' of the Eden Defendants' alleged discrimination"); *HOPE I*, 128 F. Supp. 3d at 1077–78 (finding problem with first round of initial resource-diversion standing theory was traceability to State defendants, not absence of injury in fact). As this litigation progresses, HOPE will need to substantiate the complaint's allegations supporting standing. *See Davis*, 554 U.S. at 734 (stating that "proof required to establish standing increases as the suit proceeds" (citation omitted)); *Havens Realty*, 455 U.S. at 379 n.21 (noting that organization would have to prove its standing allegations at trial).

### III. FAILURE TO STATE A CLAIM

The Alden Gardens Defendants also seek dismissal of HOPE's claims against them under Rule 12(b)(6). Their contentions come down to the same purported defect in the complaint: the

failure to allege adequately that the HOPE tester received a sufficiently definite denial to state a claim. After setting forth the procedural rules, the court first addresses a conceded basis for dismissing two of the Alden Gardens Defendants.

**A. Rule 12(b)(6) Standard**

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. *Christensen v. Cnty. of Boone*, 483 F.3d 454, 457 (7th Cir. 2007). To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

**B. The Claims HOPE Effectively Withdraws Are Dismissed**

Two of the three Alden Gardens Defendants, Horvath and Alden Gardens of Bloomingdale, LP, contend that they are improper defendants as to some of the counts because the third Alden Gardens defendant owns and operates the Supportive Living Facility and receives federal funding. The factual support for their contentions comes from the declaration of Scott Kolzow. *See* ECF No. 67-1 ¶¶ 1–2.

HOPE responds that "[a]lthough the declaration is somewhat conclusory and fails to identify what activities are carried out by Alden Gardens of Bloomingdale LP, HOPE does not

object to the dismissal of Alden Gardens of Bloomingdale LP, without prejudice" to allow it to replead against this defendant should discovery reveal contrary information. Resp. to Mot. to Dismiss 14–15, ECF No. 75. HOPE also does not object to the dismissal of Horvath as defendant to Count III, the Rehabilitation Act claim against her. *Id.* at 15.

Relying on Kolzow's declaration to decide the instant motion will convert it to a summary judgment motion. Fed. R. Civ. P. 12(d). But a dismissal at summary judgment operates as a decision on the merits with prejudice. *See Fluker v. Cnty. of Kankakee*, 741 F.3d 787, 792 (7th Cir. 2013); *Chavez v. Ill. State Police*, 251 F.3d 612, 630 (7th Cir. 2001). That does not seem to be what HOPE wants or what these defendants agree to in their reply. *See* Reply 1, ECF No. 81 (declining to address this issue further given HOPE's response). To give the parties what they want, the court takes HOPE's agreement to dismissal without prejudice as a withdrawal of these claims with permission to seek leave to replead them if it has a basis under Federal Rule of Civil Procedure 11 for doing so. *See Nolan v. City of Chicago*, No. 15-CV-11645, 2017 WL 569154, at *2 (N.D. Ill. Feb. 13, 2017) (citations omitted) (dismissing claims in complaint where plaintiff conceded he sued the wrong defendant and withdrew counts against that defendant).

**C. HOPE States Claims Under the Fair Housing Act**

HOPE pleads that the Alden Gardens Defendants violated the FHA by denying an opportunity to complete an application and the opportunity to rent a desired unit.[4] Compl. ¶¶ 123(a), (b). Congress passed the FHA, in short, "to replace the ghettos by truly integrated and

---

[4] HOPE also pleads a claim under 42 U.S.C. § 3604(c), Compl. ¶ 123(c), which makes it unlawful to:
  make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.
The Alden Gardens Defendants neglect § 3604(c) in their opening motion and supporting memorandum, so the court does not analyze it here.

balanced living patterns." *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (en banc) (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972)). HOPE tells the court that its claims implicate two sections of the FHA. The first, § 3604(f), makes it unlawful, among other things, to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter." 42 U.S.C. § 3604(f)(1)(A). The Alden Gardens Defendants assert that a formal application for housing and a subsequent denial are necessary elements of a § 3604(f)(1) claim, but they cite no authority to support their contention. Mem. Supp. Mot. Summ. J. 8, ECF No. 68. To the contrary, under federal pleading standards, a plaintiff must "at least identify the type of discrimination that allegedly occurred, who brought about that discrimination, and when that discrimination took place." *Access Living of Metro. Chi. v. Prewitt*, 111 F. Supp. 3d 890, 899 (N.D. Ill. 2015) (citing *Swanson*, 614 F.3d at 405).

HOPE's complaint does all of those things. Compl. ¶ 71. Just as in *Access Living*, which denied a motion to dismiss: "the allegations identify the type of discrimination that allegedly occurred (disability discrimination), the who [ ]), the what (specific words used by the testers and by Defendant in communicating about the property), the when and where (dates and times of telephone conversations in connection with a . . . tester's effort in [November] 2013 to rent a property), and the how ([abruptly changing the subject upon learning of the potential renter's disability and then trying to steer the tester to another facility])." *Access Living*, 111 F. Supp. 3d at 897; *see also* Compl. ¶¶ 66–71. The Alden Gardens Defendants lay great emphasis on the fact that Horvath said that she was not sure whether there was any availability. Compl. ¶ 71. Viewed in the light most favorable to HOPE, as it must be at this stage, Horvath's statement looks like a further attempt to discourage the tester, especially after Horvath's abrupt about-face upon

13

learning that the tester's aunt was diagnosed with a mental illness. *See id.*; *see also Access Living*, 111 F. Supp. 3d at 899 (complaint adequately stated claim of misrepresentation in part based on allegation that rental agent stated that unit "was inappropriate for the handicapped"). Additionally, the absence of any allegation that Horvath tried to follow up on the tester's inquiry and instead steered her to another facility plausibly pleads a discriminatory purpose. *See Smith v. Hous. Auth. of S. Bend*, 867 F. Supp. 2d 1004, 1018–19 (allegations that building owner failed to remedy problems uniquely facing tenant with disability after receiving complaints plausibly alleged § 3604(f) violation). The complaint therefore states a claim under § 3604(f)(1).

HOPE also claims the Alden Gardens Defendants violated § 3617, which makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604." To state a claim for a violation of § 3617, a plaintiff must allege: (1) she is a protected individual under the FHA; (2) she was engaged in the exercise of her fair housing rights; (3) Defendants threatened, coerced, intimidated or interfered with her on account of her protected activity under the FHA; and (4) Defendants were motivated by a desire to discriminate. *Stevens v. Hollywood Towers & Condo. Ass'n*, 836 F. Supp. 2d 800, 810 (N.D. Ill. 2011) (citing *Bloch*, 587 F.3d at 783).

The Alden Gardens Defendants assert that HOPE has failed to plead sufficiently pervasive interference to satisfy the third element. The Seventh Circuit has held that to be actionable under § 3617, interference must be "more than a 'quarrel among neighbors' or an 'isolated act of discrimination[;]'" rather, interference must rise to the level of "a 'pattern of discrimination, invidiously motivated.'" *Id.* at 811 (quoting *Bloch*, 587 F.3d at 783). This

14

requirement has been applied in situations involving allegations of harassment of a tenant by staff or other tenants and failure to provide accommodations, as when the staff of a high-rise condominium confronts a plaintiff about her emotional support dog, *see id.*, or as when a group of homeowners tear down a Jewish family's mezuzot for over a year, *see Bloch*, 587 F.3d at 783. Even so, the Seventh Circuit has determined that "failure to provide a reasonable accommodation, by itself, may amount to an interference with Plaintiffs' rights under the Fair Housing Act if it is done with discriminatory intent." *Stevens*, 836 F. Supp. 2d at 811 (citing *Bloch*, 587 F.3d at 781) (other citation omitted).

But HOPE does not need to plead a pervasive pattern of refusals to people with disabilities to state a § 3617 claim. In *Bloch*, the en banc Seventh Circuit used the following hypothetical to illustrate its construction of § 3617 with § 3604: "if a landlord rents to a white tenant but then threatens to evict him upon learning that he is married to a black woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not." *Bloch*, 587 F.3d at 782. In this hypothetical, § 3617 liability attaches to a single incident of discrimination, notably one that would have the effect of denying the plaintiff housing entirely. *See id.*

*Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1288 & n.5 (7th Cir. 1977), cited in *Bloch*, provides another example of a § 3604 violation being coterminous with a § 3617 violation. There, the Seventh Circuit reasoned that a village could violate the FHA by discriminatorily refusing to rezone. *Id.* Again, the underlying violation meant that people in the protected class would not get the housing they were seeking at all. *See id.* These cases recognize that "it would make little sense to require a showing of a pattern of harassment in the context of the alleged FHA violations relating to the sale [or eviction from or refusal to rent] a residential property" because those incidents do more than interfere with a

15

person's housing rights; they sever them, or attempt to. *United States v. Sabbia*, No. 10 C 5967, 2011 WL 1900055, at *8 (N.D. Ill. May 19, 2011) (rejecting argument that plaintiff had to plead pervasive pattern to state § 3617 claim). So because HOPE plausibly alleges a claim that the tester's 'aunt' was denied housing on account of her mental disability, it does not need to plead a pervasive pattern.

**D. HOPE Plausibly Alleges ADA and Section 504 Claims**

To state a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, a plaintiff must plausibly "allege that (1) he is a qualified person (2) with a disability and (3) the [state agency] denied him access to a program or activity because of his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (quoting *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2002)); *accord Mallett v. Wis. Div. of Voc. Rehab.*, 130 F.3d 1245, 1257 (7th Cir. 1997) (citing *Knapp v. Nw. Univ.*, 101 F.3d 473, 478 (7th Cir. 1996)). Title III of the ADA prohibits discrimination on the basis of disability in places of public accommodation. 42 U.S.C. § 12182(a) (West 2017).

The Alden Gardens Defendants attack HOPE's ADA and § 504 claims on grounds this court already rejected. They contend that HOPE's claims of discrimination are too speculative because the tester's 'aunt' did not submit an application and was not denied a place in the Supportive Living Program in so many words. *See* Mem. Supp. Mot. to Dismiss 9–10, ECF No. 68. As already explained, the complaint plausibly alleges that Alden Gardens discriminated against the tester based on the disclosed mental disability of the potential participant, i.e., the aunt. *See* Compl. ¶¶ 66–71; *see also id.* ¶¶ 71, 128, 129, 131 (establishing elements of § 504 claim, including that the proper defendant was receiving federal funding).

## IV. CONCLUSION

For the reasons stated, the Alden Gardens Defendants' motion to dismiss (ECF No. 67) is granted in part and denied in part. Counts I–III against Alden Gardens of Bloomingdale, LP, are dismissed without prejudice. Count III against Horvath is dismissed. All other relief requested is denied.


Date:  September 29, 2017                       /s/
                                        Joan B. Gottschall
                                        United States District Judge